Your Affiant, Randy Helderop, being duly sworn, hereby deposes and states as follows:

1.      Your Affiant is a Special Agent (SA) with Homeland Security Investigations assigned to the office of the Resident Agent (RA) office in Bismarck, North Dakota.   Your Affiant has been employed by HSI since September of 2004.  Your Affiant has a Bachelor of Science degree in Criminal Justice from Boise State University in Boise, Idaho, and has successfully completed the Criminal Investigator Training Program and HSI Special Agent Training at the Federal Law Enforcement Training Center in Glynco, Georgia.  Prior to his employment with HSI, your Affiant was a Special Agent with the United States Department of Health and Human Services, Office of Inspector General from 2002-2004.  Your Affiant also worked in local law enforcement as a Deputy Sheriff, Police Officer, and Detective from 1995-2002.  Your Affiant is assigned to the North Dakota Internet Crimes Against Children (ICAC) Task Force and has worked numerous investigations involving the online sexual exploitation of children.

2.      Brandon Rask is a Detective with the Bismarck Police Department (BPD) and has been employed with the Bismarck Police Department since October of 2002.  Detective Rask has in excess of 1,200 Law Enforcement training hours in addition to an Associate's degree in Criminal Justice from Bismarck State College.  Detective Rask is a member of the ICAC Task Force. Specific to the area of online child exploitation and commercial sex trafficking, Detective Rask has in excess of 200 Law Enforcement training hours and has worked on numerous investigations involving the sexual exploitation of children and has assisted on the prosecution of those cases in both state and federal court.

3.      The statements in this affidavit are based on your affiant's personal observations, training and experience, investigation of this matter, and information obtained from other investigators and

witnesses to include Detective Rask.  Because this affidavit is being submitted for the limited

purpose of securing a search warrant, your Affiant has not included each and every fact known to

him concerning this investigation.  Your Affiant has set forth the facts that he believes necessary to

establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18

U.S.C. §§ 2251(a) and 2251(e),  Sexual Exploitation of a Child; 18 U.S.C. §§ 2422(b), Coercion

and Enticement of a Minor to Engage in Unlawful Sexual Activity; 18 U.S.C. §§ 1470, Transfer of

Obscene Materials to a Minor; and 18 U.S.C. §§ 2252A(a)(2) and (b)(1), Receipt of Materials

Involving the Sexual Exploitation of Minors (further referenced as the Specified Federal Offenses)

are present in data provided to Detective Rask in electronic format from three electronic service

providers (ESPs) pursuant to search warrants issued in North Dakota District Court.  Your Affiant

makes this affidavit in support of an application for a search warrant to search the data provided to

Detective Rask pursuant to the previously authorized search warrants for violations of the Specified

Federal Offenses.

3.       The information sought and accounts to be searched are described in the following

paragraphs and in Attachments A and B.  Your Affiant has probable cause to believe that evidence

of violations of the Specified Federal Offenses is located within the electronic data provided

pursuant to the search warrants.  The data was obtained in May, June, and August of 2020 by

Detective Rask, and has not been reviewed by Detective Rask or by any other law enforcement

investigator.  The data is currently held by Detective Rask in electronic format at the Bismarck

Police Department located at 700 South Ninth Street in Bismarck, ND.  Your Affiant has reason to

believe that the data associated with Snapchat account "dakotadawson98;" Pinger account utilizing

Voice Over Internet Protocol (VOIP) number (701) 595-5511; and iCloud account identified by

Apple ID of dakotadawson@bis.midco.net will have stored information, data, and communications

that are relevant to this investigation.  This includes, but is not limited to, evidence of the identity of

the person maintaining the accounts and other social networking accounts the person has engaged

with in communications.  Thus, as outlined below, and based on your Affiant's training and

experience, there is probable cause to believe that evidence, contraband, fruits and/or

instrumentalities of the aforementioned crimes are located in these accounts.

## STATUTORY AUTHORITY

4.      This investigation concerns alleged violations of the following statutes relating to material

involving the sexual exploitation of minors:

a.      18 U.S.C. § 2252A(a)(2) and (b)(1) prohibits a person from knowingly distributing or

receiving any child pornography, as defined in 18 U.S.C. §2256(8), when such child pornography

was either mailed or shipped or transported in interstate or foreign commerce by any means,

including by computer, or attempting or conspiring to do so.   18 U.S.C. § 2252A(a)(5) also

prohibits a person from possessing or accessing with the intent to view child pornography that has

been shipped or transported in interstate commerce.

b.      18 U.S.C. §§ 2251(a) and 2251(e),  Sexual Exploitation of a Child, prohibits a person from

knowingly using, persuading, inducing, enticing, or coercing a minor, to engage in sexually explicit

conduct for the purpose of producing visual depictions of such conduct, knowing, and having reason

to believe, that such visual depictions if produced, as requested, would result in their transmission

using a means and facility of interstate and foreign commerce.  This statute also covers the attempt

to facilitate the identified criminal activity.

c.      18 U.S.C. §§ 2422(b), Coercion and Enticement of a Minor to Engage in Unlawful Sexual

Activity, prohibits a person from using a facility of interstate and foreign commerce to knowingly

persuade, induce, entice, and coerce a minor to engage in sexual activity for which any person could

be charged with a criminal offense, or attempts to do so.

d.      18 U.S.C. §§ 1470, Transfer of Obscene Materials to a Minor, prohibits a person from using

the mail or any facility or means of interstate or foreign commerce, knowingly transfers obscene

matter to another individual who has not attained the age of 16 years, knowing that such other

individual has not attained the age of 16 years, or attempts to do so.

5.      The legal authority for this search warrant application is derived from Title 18, United States

Code, chapter 121, §§ 2701-11, entitled "Stored Wire and Electronic Communications and

Transactional Records Access."  18 U.S.C. § 2703(c)(A) allows for nationwide service of process of

search warrants for the contents of electronic communications.  Pursuant to 18 U.S.C. § 2703, as

amended by the USA PATRIOT Act, Section 220, a government entity may require a provider of an

electronic communication service or a remote computing service to disclose a record or other

information pertaining to a subscriber or customer of such service pursuant to a warrant issued using

procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over

the offense under investigation.

## **DEFINITIONS**

6.      The following definitions apply to this Affidavit and its Attachments:

a.   The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of

eighteen years.

b.   The term "sexually explicit conduct," 18 U.S.C. § 2256(2)(A)(i-v), is defined as actual or

simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-

anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation;

(d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person.

c.  The term "visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

d.  The term "computer," as defined in 18 U.S.C. § 1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

e.  The term "child pornography," as defined in 18 U.S.C. § 2256(8), means any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;

   i.  such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct;

   ii.  or such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

## BACKGROUND REGARDING SNAPCHAT

7.  Snapchat is a mobile application made by Snap Inc. and is available through the iPhone App Store and Google Play. The application provides a way to share moments with photos, videos, and

text. Snapchat's differentiating feature from other communications applications is that a sender is able to set a variable amount of time the message is viewable by the receiver. This time can be between one and ten seconds. At the expiration of time, the message is deleted from Snapchat's servers. Similarly, the message disappears from the user's devices.  If the receiver of a Snapchat message does not access the application on their device the message remains undelivered. Snapchat stores undelivered messages for 30 days. After 30 days the messages are deleted from the company's servers.

8.      Snapchat users have the following abilities:

      a.      Snaps: A user takes a photo or video using their camera phone in real-time and then selects which of their friends to send the message to. Pictures and videos can also be sent from the saved pictures/videos in the gallery of the device. Unless the sender or recipient opts to save the photo or video, the message will be deleted from their devices (after the content is sent in the case of the sender and after it's opened in the case of the recipient). Users are able to save a photo or video they've taken locally to their device or to Memories, which is Snapchat's cloud-storage service.

      b.      Stories: A user can add photo or video snaps to their "Story". Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all Snapchatters or just the user's friends for up to 24 hours. Stories can also be saved in Memories.  Our Stories is a collection of user submitted snaps from different locations and events. A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event.

      c.      Memories:  Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories.

A user can also edit and send Snaps and create Stories from these Memories. Snaps, Stories, and other photos and videos saved in Memories are backed up by us and may remain in Memories until deleted by the user.

d.      Chat: A user can also type messages, send photos, videos, audio notes, and video notes to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message that they want to keep. The user can clear the message by tapping it again.

e.      Snapcash:  Snapchat also offers a money transfer service called Snapcash. Users are able to transfer up to $2,500 per week using this service. Snapcash transactions are only permitted using Visa and Mastercard debit cards issued by a United States Financial Institution. Money transfers can only occur if the sender and receiver both have Snapchat installed and have linked an appropriate debit card to their accounts. To facilitate these transactions, Snapchat retains information about the method and source of payment including debit card information such as the card number, expiration date, CVV security code, and billing address zip code. Additionally, the company may have the date of birth and social security number of those involved in money transfers.

9.     Information that Snapchat possesses and maintains:

a.      Personally Identifying Information:  When a user creates an account they make a unique Snapchat username. This is the name visible to other Snapchat users. A user also enters a data of birth. This is supposed to prevent anyone under the age of 13 from using Snapchat. An email address is required to register a Snapchat account. A new user also has

to provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code that must be entered before proceeding with the registration step. However, a user may elect to bypass entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

b.        Usage Information:  While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains log files and information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the snap before it disappeared.

c.        Device Information: Snapchat stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat.

d.        Device Phonebook and Photos: If a user consents, Snapchat can access from their device's electronic phonebook or contacts list and images.

e.        Financial information: Snapchat retains information about the method and source of payment of customers who use the Snapcash service. This includes debit card information such as the card number, expiration date, CVV security code, and billing address zip code.

Additionally, the company may have the date of birth and social security number of those involved in money transfers. Snapcash generate a receipt for any transaction. The receipts are programmed to automatically delete after the sender and recipient have seen the message and swiped out of the Chat screen, unless either taps to save the message. Snapchat maintains transactional records for ten days. These records include information about the sender and receiver, the transaction amount, and date/time stamps of when the message was sent, received, and opened.

        f.      Message Content:  Snapchat's motto is 'delete is our default.' Snapchat deletes a snap once it has been viewed. If the message is not read, because the user has not opened up the application, the message is stored for 30 days before being deleted. However, just because the snap no longer appear to the user, doesn't necessarily mean they are gone.  For example, Snapchat has a feature called Replay.  This allows users to view a previously viewed snap once per day.  This feature is disabled by default and the user must opt-in to use Replay.  Also, if a Snapchat user posts an image or video to the MyStory feature it can be viewed by their friends for 24 hours. If the user posted to the Our Stories feature, the snaps are archived and can be viewed through Snapchat.

10.    Therefore, the computers of Snapchat are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Snapchat, such as account access information, transaction information, and account application.

## BACKGROUND REGARDING PINGER

11.    Pinger, Inc., is a developer of mobile Voice Over Internet Protocol (VOIP) applications which include Sideline and TextFree, with headquarters at 97 South 2nd Street, Suite 210 in San Jose, CA (95113).  Sideline is an application that allows a second phone number for a user's

smartphone that allows calling and texting to include group messaging and picture messaging.

## BACKGROUND ON APPLE, INC AND ICLOUD

11.     Apple, Inc., is headquartered at One Apple Park Way, MS: 169-5CLP in Cupertino, CA 95014.  Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, as well as desktop and laptop computers based on the Mac OS operating system.

12.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, those services include email, instant messaging, and file storage, including the following:

   a.  Apple provides email services to its users through email addresses at the domain names "mac.com", "me.com", and "icloud.com".

   b.  Apple provides iMessage and FaceTime services, which allow users of Apple devices to communicate in real-time.  The iMessage service enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

   c.  Apple provides an iCloud service, which is a file hosting, storage, and sharing service provided by Apple.  The iCloud service can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps.

   d.  Using iCloud-connected services allows users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on

multiple Apple devices and on icloud.com; iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices; iCloud Photo Sharing allows a user to share those images and videos with other Apple subscribers; iCloud Drive can be used to store presentations, spreadsheets, and other documents; and iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. In addition, iWork Apps, a suite of productivity apps (e.g., Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. The iCloud Keychain enables a user to keep website usernames and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. "Find My iPhone" allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

13. App Store and iTunes Store are used to purchase and download digital content. Various iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on

iOS devices, and on desktop and laptop computers running either Microsoft Windows or Mac OS.

14.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

15.    An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

16.    Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status ¬of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

17.    Additional information is also captured by Apple in connection with the use of an Apple ID

to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

18.     Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage.  Apple may also maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

19.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and Photo Sharing);

documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form, but can nonetheless be decrypted by Apple.

## INDIVIDUALS WITH AN INTEREST IN CHILD PORNOGRAPHY

20.     Based on your Affiant's training and experience related to prior child sexual exploitation investigations, and the training and experience of other law enforcement officers with whom your Affiant has had discussions, your Affiant has learned that individuals who view and receive images of child pornography are often individuals who have a sexual interest in children and in images of children. These individuals may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity. These individuals often maintain their collections in electronic format either on computer, an electronic storage device, or in cloud storage areas, which can be accessible from any device with internet access and are password protected. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

21.     Individuals who have a sexual interest in children or images of children also may

correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

## BACKGROUND OF CURRENT INVESTIGATION

22.      On April 23rd, 2020, Detective Rask began an investigation into the reported conduct of Dawson Mackenzie ROUSE.  During this investigation, four juvenile females were identified as having electronic communications with ROUSE over the social media messaging application Snapchat.  The Snapchat username that was used by ROUSE for these communications was identified by Detective Rask as dakotadawson98.  Some of these females were reported to have snuck out in the middle of the night to meet with ROUSE.  As a result of this information, all four juvenile females were interviewed to determine the extent of their contact with ROUSE.  These females included 14-year-old females M.G., E.V., and A.D. as well as 13-year-old female R.J.  All of the following conduct disclosed by each of the females is alleged to have occurred between January 1st, 2020 and April 15th, 2020.

23.      During an interview with 14-year-old victim E.V., E.V. disclosed that she had become Snapchat friends with ROUSE after he had randomly requested her as a friend on Snapchat this year.  During Snapchat conversations with ROUSE, ROUSE continuously requested that E.V. send him nude images of herself via Snapchat.  The continuous pressure from ROUSE eventually led to her sending him a picture of herself in a bra in an attempt to get his requests to stop.  In a similar conversation, ROUSE asked E.V. if she would be willing to sign a consent form to engage in sexual contact with ROUSE.  Eventually, ROUSE invited E.V. to sneak out of her residence in the middle

of the night to meet with him.  This meeting occurred on April 15th, 2020.  During this meeting,

E.V. reported that ROUSE attempted to kiss her multiple times and touch her thigh, but she moved

away from him to prevent further contact.  E.V. indicated that she had two Snapchat accounts that

she had previously utilized for communications.  These accounts had usernames emmag5002 and

emma_grace20050.

24.     During an interview with 14-year-old victim M.G., she disclosed that she had become

Snapchat friends with ROUSE after he had randomly requested her as a friend on Snapchat this

year.  During Snapchat conversations with ROUSE, ROUSE continuously requested that M.G. send

him nude images of herself.  The continuous pressure from ROUSE eventually led to her sending

him numerous images that she describes to be close-up images of her nude breasts, buttocks, and

genitals.  In response to receiving these images, ROUSE returned images and videos to M.G.  M.G.

described these images and videos to depict a male's nude penis believed to be ROUSE's genitalia.

The videos, as described by M.G., depicts a male, believed to be ROUSE, masturbating.

Eventually, ROUSE invited M.G. to sneak out of her residence in the middle of the night to meet

with him.  This meeting occurred on April 15th, 2020.  During this meeting, M.G. reported ROUSE

attempted to touch her thigh, but she moved away from him to prevent the contact.  M.G. also

reported that ROUSE had referred her to another Snapchat user that ROUSE referred to as his 17-

year-old brother, Cyrus.  ROUSE does not have a brother named Cyrus and investigators later

learned through the investigation that ROUSE was also believed to be utilizing the Snapchat

account of ndcyrus98 to communicate with other victims.  M.G. indicated that she had two

Snapchat accounts that she had previously used for communications.  These accounts had

usernames of madyr.gray and mady.gray.

25.     During an interview with 14-year-old victim A.D., she disclosed that she had become

Snapchat friends with ROUSE after M.G. had friended ROUSE from A.D.'s Snapchat account

earlier in 2020. During Snapchat conversations with ROUSE, ROUSE requested a "blowjob" from

A.D. and indicated that he wanted to take her virginity. ROUSE invited A.D. to sneak out of her

home to meet with him. On an unknown night within the listed date range, ROUSE contacted A.D.

at 2:00 a.m. to ask her where he was to go to pick her up. A.D. had second thoughts and informed

ROUSE that she did not want to meet with him. Thus, the meeting between ROUSE and A.D.

never occurred. A.D. indicated that the Snapchat account username that she had been utilizing to

communicate was yoitz2snow.

26.     During an interview with 13-year-old victim R.J., she disclosed that she had become

Snapchat friends with ROUSE after adding him on Snapchat in 2020. R.J. indicated that she added

ROUSE simply because her friends E.V. and M.G. were friends with ROUSE as well. During

conversations with ROUSE on Snapchat, ROUSE convinced R.J. to sneak out of her residence in

the middle of the night and meet with him. After picking her up, ROUSE took R.J. to the detached

garage at his residence of 3603 Heartland Loop in Burleigh County. Upon arriving at this location,

R.J. indicated that ROUSE made her undress. ROUSE then retrieved a condom from a black

toolbox with his name on it. R.J. reported that ROUSE then laid her on the back of a boat that was

present in the garage and engaged in sexual intercourse with R.J. During vaginal intercourse, R.J.

reported that ROUSE held her down and pulled her hair. The used condom was thrown away after

the encounter ended. This meeting occurred on an unknown night within the listed time frame. R.J.

provided a detailed account of the physical appearance of the garage's interior as well as an account

of numerous property items that were present in the garage. R.J. indicated that the Snapchat

account username that she had been communicating from was raynnjensen.

27.     On April 24th, 2020, your Affiant assisted Bismarck Police Department detectives with the

execution of a search warrant at the detached garage of 3603 Heartland Loop in Burleigh County. Numerous long hairs were located on the back of the boat located within the garage. Two used condoms were also located in a trash can inside the garage. Furthermore, a small black toolbox with a padlock was located inside the garage. On the outside of the toolbox was a sticker with the name "Dawson ROUSE." Upon opening the toolbox, multiple boxes of condoms were located inside the storage container. The physical appearance of the garage's interior was consistent with the description previously provided by R.J.

28.    Numerous victims reported that the communications with ROUSE also occurred over text messaging. The phone number used by ROUSE to communicate with the victims was identified as (701) 934-1036. This phone number was searched within the Bismarck Police Department database and learned to be associated with Dawson ROUSE. The phone number is issued by the mobile provider Verizon. Detective Rask later obtained data related to the Verizon phone number pursuant to a search warrant issued in North Dakota District Court.

29.    In addition, M.G. reported having communicated with Cyrus over text messaging. A phone number for Cyrus was located in her phone. This phone number was identified as (701) 595-5511. Detective Rask conducted an investigation into the number and learned that this number is a Voice Over Internet Protocol number, commonly referred to as a VOIP number. VOIP is a communications protocol used by many mobile phone applications that are primarily used for the same communication purposes of a mobile phone such as calling, texting, etc. Although VOIP numbers have numerous legitimate purposes, they are also frequently used to engage in telephonic communications while attempting to hide one's identity. Through investigation, Detective Rask learned that the phone number (701) 595-5511 is a VOIP number issued by the service provider Pinger, Inc. Pinger is the developer of a mobile communication application as previously described.

The Pinger applications can be used to communicate telephonically with other phone numbers and was believed to have been utilized for such purposes in this case.  It is probable that data, consisting of subscriber information, phone call logs, text message content, etc. for VOIP number (701) 595-5511 was retained within Pinger, Inc., records.

30.     Prior to the execution of the search warrant for ROUSE's residence, a mobile phone was seized from his possession.  The phone was later determined to be assigned phone number (701) 934-1036.  The phone was one of the variations of the Apple iPhone X.  On ROUSE's phone, a screen recording video was located that showed ROUSE accessing his My Eyes Only folder within Snapchat.  My Eyes Only is a password protected storage location within Snapchat where a user can store images and videos  As ROUSE scrolled through this folder, numerous images and videos of nude females could be seen stored within this folder.  Many of these females appeared to be under the age of 18.  The files are categorized by month and year.  The oldest files seen in the screen recording are from July of 2017.  Based on this video, it is probable that the dakotadawson98 Snapchat account has been used since July of 2017 for the purpose of obtaining child sexual exploitation materials.  Some of that obtained material appears to then be stored in the My Eyes Only folder within the dakotadawson98 Snapchat account.

31.     Additional examination of the phone showed that the Apple ID associated with the phone was dakotadawson@bis.midco.net.  Detective Rask was able to determine that ROUSE's phone had been backed up to iCloud on April 24th, 2020.  It is also likely that the phone had been backed up numerous times prior to April 24th, 2020.  It is also probable that some of these data backups will contain location data, evidence of communications, evidence of stored images, etc. that are relevant to the investigation of this case.  On April 23 and 24th, Detective Rask preserved account information for the Pinger account associated with VOIP phone number (701) 595-5511; Snapchat

accounts dakotadawson98, yoitz2snow, ndcyrus98, raynnjensen, emmag5002, madyr.gray; and the iCloud account data associated with dakotadawson@bis.midco.net.

32.     On or about May 5, 2020, Detective Rask served a North Dakota District Court search warrant on Pinger, Inc. requesting data related to the VOIP number of (701) 595-5511.  On or about May 6, 2020, Detective Rask served two North Dakota District Court search warrants on Snapchat for the accounts identified as involved in the investigation.  Detective Rask also served a search warrant on Apple, Inc. for evidence related to the previously preserved account identified above.

33.     On May 26, 2020, Detective Rask received a response to his search warrant from Pinger via email.  The response included six Excel spreadsheets, two Word documents, and two PDF documents of information.  Detective Rask did not review the materials provided in the return and maintained the data in electronic format in his possession.

34.     On June 13th, 2020, Detective Rask was notified via email that the iCloud data previously requested via search warrant was available for download.  From June 15-June 24, 2020, Detective Rask downloaded the data which was provided in 14 zip files.  Detective Rask did not review the materials provided and maintained the data in electronic format in his possession.

35.     Further investigation conducted by Detective Rask and your Affiant revealed numerous minor victims that ROUSE had contacted via Snapchat and/or text messaging and had obtained or attempted to obtain illicit imagery from the individuals; arranged to meet or attempted to meet for sexual contact with the individuals, and/or transmitted obscene material to a minor under the age of 16 via electronic means.

36.     On July 8, 2020, a 27 count Indictment charging ROUSE with violations of 18 U.S.C. §§ 2251(a) and 2251(e),  Sexual Exploitation of a Child; 18 U.S.C. §§ 2422(b), Coercion and Enticement of a Minor to Engage in Unlawful Sexual Activity; and 18 U.S.C. §§ 1470, Transfer of

Obscene Materials to a Minor was brought against ROUSE.

37.     On or about August 19, 2020, Detective Rask received an email from Snapchat identifying

the requested information for the Snapchat account of dakotadawson98 was available for download.

On the same date, Detective Rask downloaded one zipped file of electronic data. Detective Rask

did not review the material provided and maintained the data in electronic format in his possession.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

38.     The data in Detective Rask's possession was obtained from the Electronic Service Providers

pursuant to search warrants authorized in North Dakota District Court. Your Affiant is requesting

an additional search warrant to review the data obtained pursuant to these search warrants out of an

abundance of caution and in order to comply with issues raised in the recent decision in United

States v. Nyah, 928 F.3d 694 (8th Cir. 2019). Additionally, as the matter has now been Indicted in

the Federal District Court of North Dakota, it is more appropriate to seek further authorization from

the federal District Court prior to accessing the data and information which was provided by the

ESPs pursuant to the previously issued State search warrants.

## CONCLUSION

39.     Based on your Affiant's training and experience, and the facts as set forth in this affidavit,

there is probable cause to believe that located within the electronic files currently in the possession

of Detective Rask at the Bismarck Police Department, there exists evidence of a crime, contraband

and/or fruits of a crime. Based on the aforementioned factual information, your Affiant respectfully

submits that there is probable cause to believe that the data located in Detective Rask's possession

and further described in Attachment A, will contain evidence of a crime, specifically but not limited

to, identification of the person who produced, received, viewed and/or distributed images of child

sexual exploitation, or attempted or conspired to do so, and additional evidence about that production, distribution, viewing and receipt. Accordingly, a search warrant is requested.

40.     While it appears this Court has ample authority to issue a search warrant relevant to Rule 41 of the Federal Rules of Crim. Pro., because this data and information was provided by electronic service providers located outside the State of North Dakota, this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3) and 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(I).

41.     Manner of execution:  Because this warrant seeks only permission to examine electronically stored information obtained from electronic service providers which was provided to law enforcement in an electronically stored format, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, your Affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

FURTHER YOUR AFFIANT SAYETH NOT

_____
Randy W. Helderop
Special Agent
Homeland Security Investigations

Subscribed and sworn to me
This ___25th___ day of August, 2020

_____
Clare R. Hochhalter
Magistrate Judge, United States District Court